**State v. Rodriquez**
**Case No. WD-89-11**
**Wood County (6th)**
**Decided January 26, 1990**
[Cite as 1 AOA 214]

*Mr. Albert L. Potter, II, Counsel for Appellant,*

*Mr. Alan R. Mayberry, Prosecuting Attorney, by Mr. David E. Woessner, Assistant Prosecuting Attorney, for Appellee.*

GLASSER, J.

This matter is before the court on appeal from a judgment of the Wood County Court of Common Pleas.

Defendant-appellant, Ruben Rodriguez, was indicted December 8, 1988 by the Wood County Grand Jury on two counts of aggravated trafficking in violation of R.C. 2925.03 Appellant entered pleas of not guilty and filed a motion to suppress evidence obtained as a result of a search conducted by members of the Bowling Green Police Department November 28, 1988. The search and appellant's arrest occurred at a house trailer owned by Josie and Barry Clark. At the time of his arrest, appellant was residing with the Clarks. Hearing were held regarding the motion to suppress on January 6 and February 1, 1989. In a judgment entry filed February 8, 1989, the trial court denied appellant's motion, and the matter proceeded to trial. On February 14, 1989, a jury found appellant guilty of two counts of aggravated trafficking. Appellant was sentenced according to law on February 17, 1989. It is from the judgment entry of sentencing that appellant filed the instant appeal setting forth the following four assignments of error:

"I. THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE AND THEREBY DEPRIVED APPELLANT OF HIS CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 14, OF THE OHIO CONSTITUTION.

"II. THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION SUPPRESS EVIDENCE AND THEREBY DEPRIVED APPELLANT OF HIS CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE FOURTH AND

FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 14, OF THE OHIO CONSTITUTION.

"III. THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN ADMITTING, OVER OBJECTION, TAPE RECORDINGS OF ALLEGED CONVERSATION BETWEEN THE INFORMANT AND APPELLANT WHERE THE RECORDINGS WERE SUBSTANTIALLY INAUDIBLE AND NOT ESTABLISHED AS BEING ACCURATE.

"IV. THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN ADMITTING, OVER OBJECTION A COPY OF THE LABORATORY ANALYSIS."

The issues set forth in appellant's first assignment of error are unique and disturbing. Reviewing the evidence presented in support of appellant's motion to suppress, this court must determine whether officers of the Bowling Green Police Department initially gained entry to appellant's residence pursuant to a search warrant.

As the party challenging the legality of the search, the burden of initially establishing whether the search was authorized by a warrant was on appellant. *Xenia* v. *Wallace* (1988). 37 Ohio St. 3d 216, 218. (Citations omitted.)

"To suppress evidence obtained pursuant to a warrantless search or seizure, the *defendant* must (1) demonstrate the *lack* of a warrant ***." *Id.*, paragraph one of the syllabus. (Emphasis added.)

In the case *sub judice*, a search warrant was presented to the trial court at the hearing on the motion to suppress. Nevertheless, under the facts and circumstances of this case, appellant sought to prove that the search of his residence was conducted without a warrant and was, therefore, *per se* unreasonable under the Fourth Amendment to the United States Constitutions.

Appellant's argument in support of suppression, as presented to the trial court, was premised upon the following facts. The search warrant is signed by Acting Bowling Green Municipal Court Judge Thomas H. Vogtsberger.

Directly adjacent to Vogtsberger's signature, in his handwriting, is a notation indicating that the warrant was signed on November 28, 1988 at 7:45 p.m. On the back of the warrant, in the area marked "RETURN OF SEARCH WARRANT," is an indication that the warrant was served on November 28, 1988 at 7:50 p.m.

Appellant's first witness at the suppression hearing, Linda McCool, testified that she and fellow officers Thomas Brokamp, Brad Conner, and Larry Canfield went to appellant's trailer at approximately 7:00 p.m. and that she left the trailer before 7:30 p.m. McCool also stated that she never personally saw the search warrant. Bowling Green Police Dispatcher Luann Susor testified that her radio traffic log indicated that two police units were in the area of appellant's trailer at 6:58 p.m. On direct examination, Susor was asked:

Q. "What was taking place at 6:58?
A. "There were four units that were headed that were aware of the search warrant that were in the general area. ***
Q. "*** Do you know that time they executed the search warrant?
A. "No I don't. That wasn't made available to me. I know that at 7:27 they [Officer Canfield and the Clark family] were en route *back to the station ****." (Emphasis added.)

At the second suppression hearing, Susor testified that she reviewed the department's computer generated log in order to verify her own work. Asked what she had determined, Susor stated, "That my times were accurate." Canfield testified that although he had no recollection of what time he was at the trailer, he never saw the search warrant.

Interspersed between the aforementioned witnesses was the testimony of Brokamp and Conner. At the first hearing, Conner stated that he went to the trailer shortly before 7:00 p.m.; that Brokamp had the search warrant and that Brokamp arrived at the trailer after he did. Conner testified that he actually saw the search warrant but did not remember what time he entered the trailer. Appellant also pursued a line of questioning relating to the search warrant affidavit:

"Q. [BY APPELLANT'S ATTORNEY] Patrolman Conner, in the search warrant itself, and I'll direct you to look at the affidavit, the affidavit indicates that this

search is contingent upon a third controlled buy. The warrant was issued at 7:45 p.m. Do you want to tell us from your review of the warrant itself what time it was executed?

"A. Well, according to the back which was filled out by Sergeant Brokamp, it wasn't filled out by myself, it says 7:50.

"Q. 5 minutes after it was issued?

"A. Yeah.

"Q. Where were the defendants, Barry and Josie Clark and Ruben Rodriquez, between 7:45 and 7:50?

"A. Well, I couldn't tell you where they were at between those times. I can tell you that they were all three in the trailer at the time we executed the search warrant.

"Q. Okay. Were they not in custody at that particular point in time?

"A. I would say they were, yes.

"THE COURT: They were in custody as you understand as under a warrant for arrest or as a result of the search?

"THE WITNESS: Well, I'm saying after we executed the search warrant, I'm saying they were placed in custody, yes.

"Q. [BY APPELLANT'S ATTORNEY] Was there this third controlled buy between 7:45 p.m. on this date and 7:50 p.m. on this date?

"A. There was a third controlled buy prior to us getting the search warrant that night, yes.

"Q. Okay. Which is referred to farther up in the body of the search warrant?

"A. Well, I think that's where. Again, I didn't type it up, but I think that's referring to where three buys have been made. Let's see, one has been made then by the confidential informant. That was the buy I was talking about. That is the third buy. It was prior to the search warrant being executed.

"Q. At 7:45 p.m., Acting Judge Vogtsberger issues the search warrant contingent upon a third controlled buy; is that correct?

"A. Well, Let's put it this way. Mr. Vogtsberger signed it at 7:45 p.m. as it's indicated here. I'm telling you that search warrant was signed and was then executed, and there had been a buy prior to that.

"Q. Which is referred to in the warrant. Was there another buy made between 7:45 p.m. and 7:50 p.m.?

"A. No. ***"

At the second suppression hearing, Conner stated that *he*, not Brokamp, placed the execution time of 7:50 p.m. on the warrant. Conner stated that he did not look at his watch but "*** probably looked at the front [of the warrant], saw it was issued at 7:45, and figured 5 minutes to get down and get in." Conner stated that he listened to the computer tape and reviewed his report prior to the second hearing in order to "*** sure things up in [his] mind as to what happened." Conner also stated that after the first hearing he had a conversation with Vogtsberger. Conner testified that he told Vogtsberger that it appeared that the radio log was wrong and the time on the search warrant was correct. Brokamp testified only at the first hearing. He stated that he added a sentence to the search warrant affidavit at the request of and in the presence of Vogtsberger. The effect of the addition, according to Brokamp, was to make the validity of the search warrant contingent upon the occurrence of a third "controlled buy." Brokamp acknowledged that the warrant was signed at 7:45 p.m. and that he executed the warrant "directly after" at 7:50 p.m. Asked what time he entered the trailer, Brokamp responded, "I would guess it was right around 7:50 to 8:00." Brokamp also stated that McCool was at the trailer when he arrived but that Canfield was not there at the time of initial entry. Brokamp was repeatedly asked by appellant to speculate as to what time the third buy occurred. In response to an objection by appellee, the court stated:

"[Brokamp] said after 7:00, before 7:45, before the search warrant was issued ***. That's what -- I don't want to put words in your --."

Brokamp responded:

"It may have been about the same time. Again, I wasn't there. I know before I served the search warrant, before I took it out, that buy did take place."

Vogtsberger testified at both suppression hearings. He stated that he had "no independent recollection" of what time he went to the police station to sign the warrant "*** other than that it was early evening on that date." Vogtsberger testified that he read the affidavit and that it was his position that if a third controlled buy occurred, the warrant could be executed.

As to the time on the warrant, the following testimony was elicited:

"Q. [BY APPELLANT'S ATTORNEY] You did sign the warrant at 7:45?

"A. I--I indicated the time on the warrant at 7:45 p.m. the source of the information relative to the time probably would come from one of three places. It could have been me looking at my wristwatch, me looking at a clock that was present in the room, or Brokamp giving me the time from his watch. I can only speculate as to which of those three things occurred. I can't state unequivocally that I looked at my watch or it came from the other two sources.

"I guess the answer to my question, I was under the impression that the buy had been made. That I was not aware of that or that it was in progress simultaneously with my issuance of the warrant or it was going to be made shortly after the warrant was issued, but the instructions I felt were that the buy had to be completed before the warrant could be served and the search performed.

"Q. Was it your impression then that that buy, as far as the contingency then, was the same buy that is referred to in the second sentence of that affidavit?

"A. I believe so. I--you know, I believe that my impression was that those are one, not two, because I--may be wrong on this, but I thought it had been prepared when I arrived as if it had already occurred. But Brokamp was not certain that it had already occurred, so he said no, it hasn't already occurred. He can't swear that it has, so I would put it in as a contingency. I believe that's what's occurred, that is what occurred."

At the second hearing, Vogtsberger referred to his conversation with Conner. He stated that they had reviewed the case and that he had concluded "* * * that the time on the warrant is correct because we have gone back, and if I understood correctly, gone back and established that the buy money was marked at 7:05, so therefore the buy money having been marked prior to the execution of the warrant, the warrant time should be correct. * * * We were able to at least look to some extrinsic evidence as to what the actual time was."

In response to the evidence presented, appellee argued that the basis for the court's decision should be the testimony of Brokamp and Conner who stated that they had a warrant before they entered the trailer. Appellee asserted that the time on the search warrant (7:45 p.m.) and the time on the photocopy of the buy money (7:00 p.m.) were *both* incorrect and should have been 6:45 and 6:00, respectively. Arguing that such a clerical "mistake" is not enough to invalidate the warrant, appellee suggested that Conner and Vogtsberger were both looking at the same clock on the night of November 28, 1988 and that the clock was set one hour ahead of the actual time.

In a judgement entry filed February 8, 1989, the trial court denied appellant's motion to suppress. The court stated:

"[T]he Court finds from all of the evidence before it that the defendant has not established by a preponderance of the evidence that the officers had lied when they testified that they had the search warrant at the time of the search. Certainly, sloppy police procedures occurred, but the Court finds that the defendant has not met his burden of proof. Therefore, this Court reluctantly may not suppress the fruits of the search of the defendant and his residence."

Our analysis of the facts and circumstances of the case *sub judice*, in conjunction with relevant case law, leads us to conclude that the burden of proof laced on appellant was unreasonable. We find that once the movant demonstrates, by a preponderance of the evidence, the "lack of a warrant" the burden of persuasion shifts to appellee to show that a valid warrant existed or, alternatively, to justify the warrantless search.

In the instant case, appellant produced evidence showing that the warrant was issued at 7:45 p.m. and executed at 7:50 p.m. appellant showed that the "buy money" was photocopied by Conner at 7:00 p.m. and that the "third controlled buy" occurred at approximately 7:15 p.m. The radio log, the computer generated log and various sources of testimony indicated that officers were at appellant's trailer between 7:00 and 7:30 p.m. and that Canfield transported the Clark family to the police station at 7:27 p.m. Two of the officers present at the trailer stated that they never saw a search warrant. Brokamp and Vogtsberger both stated that it was their understanding that the third buy

occurred *before* the warrant was *issued*.

In response, appellee produced the testimony of Brokamp and Conner. Both officers stated that they had a warrant when they entered the trailer. Appellee explained the time discrepancies as a "clerical mistake" and characterized the entire issue as focusing on the credibility of the witnesses.

Our analysis of the record indicates that the preponderance of evidence shows that the search warrant was issued *after* the officers initially entered the trailer. In contrast to the trial court's conclusion, we find that once such evidence was adduced, it would be more efficient to shift the burden of production to the party, in this case, appellee, who has most ready access to the persons who know the relevant facts. Requiring appellant to prove "the negative," left the trial court with the task of guessing which scenario was more impossible, *i.e.* were two nearly identical clerical errors made or were two officers mistaken in regard to the existence of the warrant.

Confronted with the possibility that the trial court would determine that the search was conducted without a warrant, appellee argued that the search should be upheld as incident to a lawful arrest and that exigent circumstances existed. In its denial of the motion to suppress, the trial court stated:

> "If the Court had found that the search had occurred without a warrant, the search could not be upheld as a search incident to a lawful arrest, because the forced entry into the residence of the defendant was unlawful and exigent circumstances did not exist."

Upon review of the extremely brief argument regarding exigent circumstances," we find that appellee failed to demonstrate that circumstances were present which would overcome the presumption of unreasonableness that attaches to all warrantless home entries. See *Welsh* v. *Wisconsin* (1984), 466 U.S. 740, 749.

Accordingly, we find that appellant demonstrated, by a preponderance of the evidence, that the initial entry into his residence occurred without a warrant. We further find that appellee failed to justify this warrantless search and that, therefore, appellant's motion to suppress should have been granted. For the aforestated reasons, we find appellant's first assignment of error well-taken.

In his second assignment of error, appellant argues that it was error to overrule his motion to suppress because the affidavit upon which the search warrant was issued failed to support a finding of probable cause. Appellant asserts that the affidavit contains only "bare conclusions" that drug sales occurred and that it fails to state that the affiant had personal knowledge of such sales.

Given this court's disposition of appellant's first assignment of error, appellant's second assignment of error is technically moot. Nevertheless, in the interest of judicial economy and in view of the issues presented, we have chosen to evaluate appellant's arguments.

Crim. R. 41(C) delineates the standard for issuing a search warrant:

> "(C) **Issuance and contents.** A warrant shall issue under this rule only on an affidavit or affidavits sworn to before a judge of a court of record and establishing the grounds for issuing the warrant. The affidavit shall name or describe the person to be searched or particularly describe the place to be searched, name or describe the property to be searched for and seized, state substantially the offense in relation thereto, and state the factual basis for the affiant's belief that such property is there located. If the judge is satisfied that probable cause for the search exists, he shall issue a warrant identifying the property and naming or describing the person or place to be searched."

As a reviewing court, the "* * * appellate court's task is to ensure, through a conscientious review of the affidavit, that the issuing magistrate had a substantial basis for concluding that probable cause existed." *State* v. *Bean* (1983), 13 Ohio App. 3d 69, paragraph one of the syllabus.

This court also stated:

> "In assessing the affidavit's legal sufficiency, an appellate court may draw reasonable, common-sense inferences from the allegations contained therein, but such inferences are valid only when they are drawn from facts actually set forth in the affidavit." *Id.*, paragraph two of the syllabus.

In the case *sub judice*, the challenged affidavit states, in relevant part:

"I, Sgt. T.R. Brokamp * * * state the following facts and circumstances in support of my belief that:

"* * * The above named residence is the place where 3 drug buys have been made in the last 2 months. One has been made tonight by a confidential informant while on the body wire. The above named residence has been the temporary residence of Ruben Rodriguez, who was the subject of another search warrant and has been convicted of possession of Cocaine subsequent to that search. He has been the subject of surveillance [*sic*] over the last year, and is a known drug trafficker. This search is contingent on the third controlled buy at the above named residence."

The affidavit, sworn to by Brokamp, sets forth facts and circumstances upon which Brokamp based his application for a search warrant. Further, despite appellant's assertion, the affidavit clearly states that Brokamp had personal knowledge of the allegations therein. In reviewing the overall adequacy of the statement, we find that the stated facts were sufficient to provide the issuing judge with reasonable ground to believe that evidence would be found in the stated location.

In an alternative argument, appellant asserts that he was prevented from inquiring into Conner's good faith reliance on the search warrant. In *United States* v. *Leon* (1984), 468 U.S. 897, the Supreme Court of the United States recognized a "good faith exception" to the warrant requirement. This exception, however, is only applicable if the court is called upon to apply the exclusionary rule to a search conducted pursuant to a warrant that is subsequently determined to be *invalid*. Accordingly, by virtue of our finding that probable cause existed to issue the warrant, appellant's alternative argument is rendered moot.

For the aforestated reasons, we find appellant's second assignment of error not well-taken.

In his third assignment of error, appelllant argues that the trial court abused its discretion in admitting audio tapes into evidence which were "substantially inaudible." Appellant asserts that the tapes, allegedly recordings of his conversations with the informant, were not established as accurate and should have been reviewed by the court prior to trial.

Bowling Green police officers made the audio tape recordings of two incidents with informant Scott Drury during which appellant allegedly sold cocaine to Drury at Drury's request. The recordings were procured through the use of a device concealed on Drury's person. Both tapes contained varying degrees of background noise and are, to some extent, unclear and inaudible. The trial court permitted appellee to play the tapes during Drury's testimony; admitted the tapes as evidence; and allowed the jury to replay the tapes during its deliberations.

Reviewing a substantial number of federal cases, the Lorain County Court of Appeals set forth the following criteria to be used in evaluating the admissibility of audio tapes:

"In order to be admissible, audio recordings must be authentic, accurate and trustworthy. * * * Admission into evidence of tape recordings containing inaudible portions is a matter within the sound discretion of the trial court. * * * In determining whether to admit tape recordings, the trial court must assess whether the unintelligible portions are so substantial as to render the recordings as a whole untrustworthy. * * *" *State* v. *Gotsis* (1984), 13 Ohio App. 3d 282, 283. (Citations omitted.)

In the case *sub judice*, appellee presented testimony as to the recording and chain of custody of both tapes. Appellant has not argued that the recordings were falsified or altered in any way. Drury testified extensively as to the content of each tape as it was played. The manner in which Drury's testimony was elicited, stopping and starting the tape, may have been distracting to the jury but was not prejudicial to appellant. Appellant was afforded the opportunity to cross-examine Drury concerning the taped conversations and had the opportunity to offer his version of the less audible portions so as to clear up any questions raised by the tapes. The tapes were clearly relevant in corroborating the testimony of Drury, Conner and Brokamp. Further, only the tapes accompanied the jury to its deliberations. No transcript of the tapes was provided nor was Drury's explanation preserved for the jury beyond his actual testimony. Under these circumstances, we find that the trial court did not err or abuse its discretion. Accordingly, we find appellant's third assignment of error not

well-taken.

In his fourth assignment of error, appellant argues that the trial court erred in admitting a copy of the laboratory analysis. At trial, appellant objected to admission of the analysis on the ground that appellee had not attached a "notarized statement" as required by R.C. 2925.51(A).

In relevant part, R.C. 2925.51(A) provides:

"(A) In any criminal prosecution for a violation of this chapter or Chapter 3719. of the Revised Code, a laboratory report from the bureau of criminal identification and investigation * * * stating that the substance which is the basis of the alleged offense has been weighed and analyzed and stating the findings as to the content, weight, and identity of the substance and that it contains any amount of a controlled substance and the number and description of unit dosages, is prima-facie evidence of the content, identity, and weight or the existence and number of unit dosages of the substance.

"Attached to that report *shall be a copy of a notarized statement* by the signer of the report giving the name of the signer and stating that he is an employee of the laboratory issuing the report and that performing the analysis is a part of his regular duties, and giving an outline of his education, training, and experience for performing analysis of materials included under this section. The signer shall attest that scientifically accepted tests were performed with due caution, and that the evidence was handled in accordance with established and accepted procedures while in the custody of the laboratory. (Emphasis added.)

In the case *sub judice*, Scott Dobransky, a chemist employed by the Ohio Bureau of Criminal Identification and Investigation, testified that tests performed on Exhibits 3-A and 3-B indicated that both were cocaine. Dobransky stated that Exhibits 12 and 13 were reports sent to the Bowling Green Police Department indicating the results of his analysis. During direct examination of Dobransky, appellant stipulated as to Dobransky's qualifications as a chemist and to the chain of custody of the evidence. Appellant did not question Dobransky about the failure to attach notarized statements on cross-examination; however, appellant's objection to Exhibits 12 and 13 was noted at the time appellee moved for their admission.

We have carefully examined R.C. 2925.51(A) and have concluded that the statute *requires* that such notarized statement be attached to a laboratory report before such report is admissible as "* * * prima-facie evidence of the content, identity, and weight * * * of the substance." However, in the case *sub judice*, appellant clearly stipulated to each provision which would have been contained in the statement. Accordingly, based narrowly upon the circumstances of the instant case, we find that appelle's failure to attach the required statement was harmless and did not render Exhibits 12 and 13 inadmissible. For the aforestated reasons, we find appellant's fourth assignment of error not well-taken.

On consideration whereof, the court finds that appellant was prejudiced from having a fair trial, and the judgment of the Wood County Court of Common Pleas is reversed. This cause is remanded to said court for proceedings not inconsistent with this decision. It is ordered that appellee pay court costs of this appeal.

*JUDGMENT REVERSED*

GLASSER, J., ABOOD, J., Concur.

Prior to his death, Judge John J. Connors, Jr., did participate in the decision-making process of this case.