JOURNAL ENTRY and OPINION
A jury found defendant Roy Hudson guilty of six counts of drug-related criminal activity: two counts of possession of drugs, two counts of trafficking and two counts of preparation of drugs for sale. He has nine assignments of error — the most strenuously argued being that plain error occurred when the court permitted drug enforcement personnel to testify as to the contents of a laboratory report containing the chemical analysis of the drugs.
The facts are relatively straight-forward. With the aid of an informant, Drug Enforcement Agency officers, working in tandem with the Cleveland Police Department, arranged for the informant to purchase a large quantity of cocaine. The informant had claimed to know where he could purchase large quantities of cocaine. When given the go ahead from the police, the informant contacted Larry Lavelle Smith. Smith indicated that he could not personally supply the quantity the informant wanted, but he had a source who could.
On the date of the transaction, the police hid a radio transmitter on the informant and gave him $1,000 in cash. The informant used a pager to communicate with Smith. A DEA agent explained that pagers were the usual method of communication, with the buyer simply inputting in numeric form the dollar amount of cocaine to be bought; for example, inputting "900" meant that the buyer wished to purchase $900 worth of cocaine. This method was meant to prevent any explicit mention of drugs in the event the police later investigated the pager.
The informant went to Smith's house and waited nearly two hours for defendant to arrive. A tape recording of the radio transmissions showed that when defendant arrived, someone in the house said "there he is." Defendant handed .75 ounces of cocaine to Smith, who then handed the cocaine to the informant. The informant paid $600 and left.
Defendant left the house shortly after the informant. A DEA agent tried to follow defendant, but defendant drove as though he knew he were being followed — he made a u-turn on a major thoroughfare and continually looked over his shoulder to see if he was being followed. The DEA agent called off surveillance so as not to be discovered.
Two months later, the police used the informant to set up a second cocaine buy with defendant. The informant paged defendant directly and inputted "900" as the amount of drugs to buy. During a second telephone call with defendant, the informant clarified the time for their meeting. While referencing the amount of cocaine that the informant wished to buy, defendant asked "what is that, one?", as in one ounce.
The transaction went without incident. Defendant arrived at Smith's house. He drove a car belonging to his sister. Defendant handed the drugs to the informant, who then counted out the correct amount of money. The transaction ended quickly.
Defendant testified and denied participating in the transactions. He claimed that his association with the informant began because the informant sold automobiles as a side business and he wished to purchase one. He claimed the money he gave the informant constituted a down payment for a car, and that there were no drugs present at the scene.
 I
The first assignment of error complains that plain error occurred when the court permitted police officers to testify to inadmissible hearsay when they reported the results of laboratory analysis on the cocaine without requiring those responsible for preparing the report to testify to its contents. The reports at issue contained laboratory analyses of the separate cocaine buys from defendant. Collectively, the reports verified that the substances tested were cocaine and established the exact weight of each sample. Defendant maintains that neither police officer who mentioned the reports had personal knowledge regarding the tests performed or the manner in which the tests were conducted, so their testimony necessarily constituted inadmissible hearsay.
Defendant readily concedes that counsel did not object to the officers' testimony, so we must review this assignment for plain error. Plain error does not exist unless the outcome of the trial would clearly have been different. State v. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus. Notice of plain error must be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. Id. at paragraph three of the syllabus.
R.C. 2925.51(A) creates an exception to the hearsay rules. That section states that the results of a laboratory analysis if prepared by a qualifying agency or accredited institution of higher learning constituteprima facie evidence of the content, identity, and weight, or the existence or number of dosages of the substance tested. The report must contain a copy of a notarized statement by the signer of the report giving the name of the signer, the report must state the person signing the report is an employee of the laboratory issuing the report and that the employee conducts analyses as part of his regular duties, and there must be an attestation in the report that the laboratory tests were conducted with due caution and in accordance with established and accepted procedures. Id. The report must be served to the attorney representing the accused prior to any proceeding in which the report may be used. See R.C. 2925.51(B). The only time the report is not consideredprima facie evidence of the contents, identity and weight of the substance tested is when the accused, within seven days of receiving the report, demands the testimony of the person signing the report. See R.C.2925.51(C).
State's Exhibits E and F are photocopies of the chemical analysis reports prepared by the Drug Enforcement Agency's North Central Laboratory. The reports contain all the requirements set forth in R.C.2925.51(A) save one: they do not show a notarized statement by the signer of each report.
In State v. Rodriquez (1990), 66 Ohio App.3d 5, the court of appeals held that R.C. 2925.51(A) "requires" that a notarized statement be attached to the report before the report could be considered admissible as prima facie evidence. The court did find, however, that a party could stipulate to the admissibility of the report absent the technical requirements being fulfilled. 66 Ohio App.3d at 17.
At the close of evidence, when considering the state's exhibits, the court asked defense counsel if he had any objections to the admission of the state's exhibits. Defense counsel made a specific objection to the admission of some tape recordings, but when pressed by the court for any other objections said "[n]one. Other than those objections."
We would not characterize defense counsel's decision not to object to the admission of State's Exhibits E and F as a "stipulation," but counsel's knowing decision not to object had the same net effect. By refusing to object, counsel impliedly conceded the admissibility of the documents, and must be deemed to have waived any material defects in form.
Moreover, we discern no actual prejudice from the failure to object since the outcome of trial would not have changed. Defendant makes no argument that a properly notarized chemical analysis would have differed in any material respect from the exhibit presented at trial. The trustworthiness of such analyses has long been recognized by the courts, and some courts permit laboratory analyses like those in this case to be admitted under the different exceptions to the hearsay rule. See, e.g.,Howard v. United States (D.C.App.), 473 D.C.App. 835 (collecting cases);Commw. v. Karvontka (1989), 384 Pa. Super. 346; People v. Tsombanidis
(Ill.App. 1992), 235 Ill. App.3d 823. Given the inherent degree of trustworthiness attached to such analyses, it is highly unlikely that defendant would have been able to impeach the veracity of the chemical analysis even if the notary seal had been attached to the document. And defendant makes no argument that he would have proceeded differently had a notary seal been placed on the document. So we cannot say that the outcome of trial would have been different. The first assignment of error is overruled.
 II
In his second assignment of error, defendant maintains the court erred by admitting other acts testimony by his fiancé, a defense witness, who was ordered to respond to the state's question whether she was "scared" of defendant or had called the police on him. The state wished to show that the fiancé had filed a police report in which she claimed that defendant said he would hire someone to kill her. Over a defense objection, the fiancé admitted calling the police, but denied saying that defendant had told her he would hire someone to kill her. Defendant complains that the fiancé's testimony went beyond her direct examination and that he had not learned of this incident until the state proffered at the sidebar the substance of the incident.
The court has wide latitude in determining what evidence to admit at trial, subject only to an abuse of discretion. State v. Bey (1999),85 Ohio St.3d 487, 490.
The fiancé testified on cross-examination to an incident in which she claimed that two robbers, one of whom she later identified as Lavelle Smith, accosted her at gunpoint. After saying that she was still "very scared," the state asked her "who are you scared off?" The fiancé replied that she was "scared of everyone now." The state then asked, "are you scared of the defendant?" When the fiancé denied being scared of defendant, the state asked if she had ever called the police on defendant. The state claimed it asked this question because the fiancé claimed she loved defendant very much and that she and defendant had a wedding date scheduled for about one year.
Although defendant couches his argument in terms of Evid.R. 404(B), which prohibits evidence of other crimes or wrongs if submitted to prove the character of person in order to show that he acted in conformity therewith, the record shows the court rejected this as a basis for compelling the fiancé's answer. The court said:
 I don't think defense has opened up the door as to the issue of character yet. You've tiptoed around it but I wouldn't say you're there yet. But the big but is she's up on the witness stand testifying that she was accosted at gunpoint by two guys. She's saying that she's scared of everybody. You know, she's trying to allege that these people who are testifying against her fiancé have done so because of their animosity towards him and her. I think it's only appropriate for the prosecutor to present alternative theories of what she's just testified to in this case for about an hour now, including yesterday. In other words, she's saying, "I'm afraid, that I was apprehended at gunpoint in the garage, they took me to my apartment," she's been up on the stand tearing up yesterday and today. I think the prosecutor is permitted to ask her about alternative theories of who did what.
The court's actual basis for permitting the state's questions did not amount to an abuse of discretion because the questions went to the witness' credibility, a matter governed by Evid.R. 611(B), which permits cross-examination "on all * * * matters affecting credibility."
The court correctly noted that the state had every right to pursue a line of questioning designed to elicit the true identity of those who had allegedly held her at gunpoint. Despite making a police report against the two men who allegedly robbed her, the police reported that the fiancé had been an "uncooperative" complainant. By asking whether defendant had threatened the fiancé, the state was delving primarily into the victim's versions of events, not into defendant's acts. We find no abuse of discretion.
 III
The third assignment of error complains that counsel was ineffective because he failed to introduce into evidence an audio cassette taken from a tape recorder placed on the informant's body, labeled as State Exhibit I "N7." Defendant claims a small portion of this tape would have corroborated his testimony that he was at Lavelle Smith's house to buy a car. That tape had been damaged, but the state offered a second recording made at the same time by another recording device attached to radio transmitter. Defense counsel stipulated that the tapes were identical. Defendant now claims that State Exhibit I "N7" contains his statement, "Is this the Lincoln you were talking about?" and the sound of paper rustling while the informant asks, "How much you got there?" Defendant claims the statement about the car corroborates his story that he had been at Lavelle Smith's house solely to buy a car.
An offender trying to demonstrate ineffective assistance of counsel must show that counsel violated an essential duty towards the client and that the violation prejudiced the defense. Strickland v. Washington
(1984), 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052; State v. Bradley
(1989), 42 Ohio St.3d 136.
Two tapes of the drug buy were made. The first tape, State Exhibit I, was made off the radio wire. The second tape, State Exhibit I "N7," was taken from a cassette recorder placed on the informant's body. The second tape was produced to the defense during discovery. During cross-examination of one of the DEA agents, defense counsel played State Exhibit I "N7," and asked the agent whether "[t]his version says, "Is this the Lincoln you were talking about?" The agent replied affirmatively, but then pointed out that the tape played by defense counsel was different from that played by the state. When counsel had difficulty re-cuing the tape, the court told counsel he should compare the tapes at recess and that his question about the Lincoln automobile was withdrawn. At the close of the defense case, counsel for both sides stipulated that there were no discrepancies between the tapes.
It is by no means clear to us that counsel violated an essential duty by failing to introduce State Exhibit I "N7" into evidence. The court told the jury that the parties were having difficulty re-cuing the tape, so it had instructed the attorneys to meet during the recess and compare the two tapes as to consistency or authenticity. At that point, the court told the jury that counsel's question "is withdrawn." After counsel stipulated to the tapes, he argued in closing that the state had failed to present "the entire conversation" as recorded by the body microphone.
But even if there was a breach of an essential duty, defendant has not shown prejudice. Defendant maintains that counsel should have affirmatively argued that the tape recording showed that he had been at Smith's house for the sole purpose of buying a car. Our review of the tape convinces us that the reference "Is this the Lincoln you were talking about?" was not strong enough to convince a reasonable trier of fact that defendant had been present to buy a car. It may well have been that defendant knew that Smith was selling a car, but the evidence showed his primary purpose in being at Smith's house was to sell drugs. Had counsel proceeded as suggested by defendant, the tactic could well have backfired. The jury might have viewed such a weak argument as reflecting poorly on the entire case. We cannot say that there is demonstrable prejudice on this record.
 IV
The fourth assignment of error is also related to the cassette tapes and complains that the court abused its discretion by admitting into evidence portions of the tapes that were not played during trial and admitting into evidence a tape that was not played at all.
We fail to understand defendant's complaint since, as defendant notes, there is no indication "of which parts were played and which were not." See Appellant's Brief at 25. If the record is unclear, defendant cannot exemplify any error. This is important because the record suggests that, contrary to defendant's assertions, State Exhibit I "N7" was played for the jury. The following is cross-examination of the DEA agent by defense counsel:
 Q. Now, I'm going to take a tape. It was referred to earlier as N7. Do remember the prosecutor asked you about this N7 tape?
A. Yes, sir.
 Q. That N7 tape is for October 19, 1999, isn't that correct?
A. Yes, sir.
 Q. That tape is also the one where Roy Hudson comes to the house there on 12309 Farringdon, isn't that correct?
A. Yes, sir.
 Q. I'm going to play the version of the tape that was copied earlier and I want you to tell me if that tape is the same as the tape that was played earlier for the jury?
A. Okay.
(Thereupon, the tape was played for the jury.)
 Q. This version says, "Is this the Lincoln you were talking about?"
A. That's what I just heard, yes. (Tr. 425.)
The record shows that the tape had been played to the jury, contradicting defendant's argument that the tape had not been played. See Appellant's Brief at 25. Because the record convincingly refutes or otherwise fails to support defendant's argument, this assignment of error must be overruled.
 V
The fifth assignment of error complains that the verdict is against the manifest weight of the evidence. Defendant points to what he considers to be inconsistencies in the testimony and evidence, primarily that which support his theory that he went to Smith's house for the sole purpose of buying a car and was mistakenly fingered as a drug dealer.
Giving the jury's primary function in determining the credibility of witnesses, State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus, we cannot say that it wrongly resolved questions of credibility against defendant. Defendant's theory that he had been in the wrong place at the wrong time might have been colorable had it happened only once. But on two separate occasions he was present when the informant bought drugs. This was more than coincidence and the jury was free to reject the argument.
We are untroubled by the absence of any explicit statements on the tapes relating to drugs. A DEA agent explained that most drug buys are conducted without such references, as a precaution in case drug enforcement officers are listening. This explained the slang used by the participants, and particularly the method of calling a pager number and inputting digits that represent the dollar amount of drugs the buyer wishes to purchase.
It is true that the informant had a very long criminal record, and admitted becoming an informant in order to obtain a lesser sentence in a pending criminal case. But the informant also conceded that he had been promised nothing, and it seems unlikely that wired as he was during the drug buys, he could have manipulated the process to his own advantage. There was no question that he went into the buys with a set dollar amount and no drugs on his person, and returned from those buys with drugs and less cash. A transaction had been made and the informant's motive for cooperating did not change that fact.
Finally, any complaint that defendant had been present at the scene for the purpose of buying one of Smith's cars was not wholly incompatible with the drug transactions. The state rightly points out that nothing in the tapes, aside from one comment about the "Lincoln," could remotely suggest that defendant was interested in buying a car. The transactions occurred quickly and efficiently, with no time at all given to discussing cars. The jury did not lose its way.
 VI
In his sixth assignment of error, defendant complains that the court failed to include written jury instructions in the record, so as to preserve them for possible use on appeal.
R.C. 2945.10(G) says "[w]ritten charges and instructions shall be taken by the jury in their retirement and returned with their verdict into court and remain on file with the papers of the case. * * *." This requirement is meant to ensure that a reviewing court will be able to determine if error exists in the jury charge. State v. Smith (1993),87 Ohio App.3d 480, 482. As with most trial errors, however, a showing of prejudice is necessary before a new trial is warranted.
Defendant points to no prejudice whatsoever from the court's failure to include the written jury instructions in the record, and the record shows that neither party objected to the court's instructions as read to the jury. Absent a showing of prejudice, we find the court's failure to include the written instructions in the record is harmless error. SeeState v. Nichols (Mar. 2, 2000), Cuyahoga App. Nos. 75605 and 75606, unreported.
Our decision in State v. Melton (May 4, 2000), Cuyahoga App. No. 75792, unreported, is not to the contrary. In that case, the state conceded that reversible error occurred, so the panel had reason to presume prejudice. Because no prejudicial error is argued or proven on the record, we overrule this assignment.
 VII
In the seventh assignment of error, defendant maintains that the offenses of trafficking in drugs and possession of the same drugs are allied offenses of similar import because they stemmed from the same motive to sell the drugs that defendant possessed. He argues that his convictions for possession should be vacated under R.C. 2941.25(A).
R.C. 2941.25 provides:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
R.C. 2945.25(A) is intended to prohibit duplication of punishment where multiple crimes are motivated by the same purpose and where conviction of both would be dependent upon identical conduct and similar evidence.State v. Brown (1982), 7 Ohio App.3d 113.
In State v. Hankins (1993), 89 Ohio App.3d 567, 570, the Third District Court of Appeals reviewed the elements of possession of drugs and sale of drugs and stated:
 Having reviewed these elements, we are of the opinion that appellant's violations of R.C. 2925.03(A)(1) and (A)(4) are not allied offenses of similar import. It is possible for a defendant to possess illegal drugs without offering them for sale. It is also possible to offer illegal drugs for sale without actually possessing the drugs or transferring them to the buyer. State v. Scott
(1982), 69 Ohio St.2d 439, 23 O.O.3d 390, 432 N.E.2d 798. For example, a defendant may act as a middleman soliciting buyers of illegal drugs for the individual who actually possesses the drugs; or, a defendant may offer some nonproscribed substance, such as baking soda, for sale under the ruse that it is cocaine. Either of these behaviors could result in violations of R.C. 2925.03(A)(1) without also violating R.C. 2925.03(A)(4). In addition, the Sixth District Court of Appeals has indicated that the amounts of a controlled substance required to create violations of the two paragraphs make the two offenses mutually exclusive. State v. Smith (June 19, 1992), Sandusky App. No. S-92-1, unreported, 1992 WL 139917.
Drug trafficking under R.C. 2935.03 requires an element of sale, whereas possession of drugs under R.C. 2925.11 only requires that a person "obtain, possess, or use a controlled substance." Because the possession statute does not include the element of sale or an offer to sell, the elements of the crime are not same, and the offenses are not allied. State v. Johnson (2000), 140 Ohio App.3d 385.
 VIII
The eighth assignment of error complains that the court erred by ordering consecutive sentences because it failed to make the findings required by R.C. 2929.14(E)(4) and failed to state a reason for making a finding as required by R.C. 2929.19(B)(2)(c). Defendant maintains this was not an unusual case that would have justified the imposition of consecutive sentences.
In order to impose consecutive sentences, the court must find that consecutive sentences are necessary in order to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. See R.C. 2929.14(E)(4). The court must also find (1) the offender was awaiting trial or sentencing on another offense, was under community control, or was under post-release control; (2) the harm caused was great or unusual and that no single prison term would adequately reflect the seriousness of the offender's conduct; (3) the offender's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crime by the offender. Id.
The court made the following remarks at sentencing:
 It's not just any crime, you know. It's selling drugs in the community. And, you know, you're selling them to members of your community. And just think of all the death and destruction and sadness and pain and tragedy that have come from that.
 It is, you know, a crime so offensive that the State legislature has required that I impose a mandatory term of incarceration in these counts. But how much time is enough? You know?
 He does not have an extensive record, but he does have drug convictions.
 What I'll do is this. In Count 1, I will impose a three year period of incarceration. In Count 2, a three year period of incarceration. In Counts 3 and 4, three year periods of incarceration. In Counts 5 and 6, an eighteen month period of incarceration.
 I will run Counts 1 and 2 concurrent and Counts 3 and 4 concurrent. But I'm going to run Counts 1 and 2 and 3 and 4 consecutive to one another. So you're going down for six years today. I will also run Counts 5 and 6 concurrent to both. * * *
 So you're going to do about five, and I think that when you consider the fact that you could have got 39 years, that you're being treated lenient [sic.]. Part of, you know, part of my job is to temper justice with mercy, and to protect people from themselves.
The court did not make all of the requisite findings. It arguably found that consecutive sentences were necessary to protect the public from future crime when it referenced the "members of the community" as being impacted by these drug offenses. However, the court failed to consider whether the sentences were proportionate to the seriousness of defendant's conduct, and it failed to list any one of the three factors listed in R.C. 2929.14(E)(4)(a)-(c). These were not unusual drug offenses and nothing in the record shows that the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses would adequately reflect the seriousness of defendant's conduct. Likewise, the court failed to consider that defendant's history of criminal conduct demonstrates that consecutive sentences were needed to protect the public from future crime. In fact, the court noted that defendant did not have an extensive record. We sustain this assignment of error and remand for resentencing.
A final point. When advising defendant of his appeal rights, the court told defendant to keep in mind that were defendant to exercise his right to appeal and win a new trial, he might risk being tried again and resentenced, and that sentencing could be assigned to another judge and "theoretically there is some risk that you could get more than six years. Do you understand what I'm saying. So you consult with [defense counsel] and let us know what your determination is as to this issue of appeal."
The court's statements went beyond what was needed in advising an offender of appellate rights under Crim.R. 32(B), and might be viewed by some as trying to discourage an appeal lest a greater sentence be imposed should the offender be convicted again. The court should limit itself to advising an offender of the right to appeal, and leave the tactical decisions involved with an appeal to the offender and counsel.
 IX
The ninth assignment of error is a catch-all, arguing that if this court overrules various assignments of error, we should find that counsel was ineffective. Because we have found no violations of essential duties owed by counsel, we summarily overrule this assignment.
Judgment affirmed in part, reversed in part and remanded for resentencing.
This cause is affirmed in part, reversed in part and remanded for resentencing for proceedings consistent with this opinion.
It is ordered that appellee recover of appellant its costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ROCCO, J., CONCURS. KARPINSKI, A.J., DISSENTS WITH SEPARATE OPINION.