B<small>OWMAN</small> and T<small>YACK</small>, JJ., concur.

The STATE of Ohio, Appellee,

v.

DIXON, Appellant.

[Cite as State v. Dixon, 152 Ohio App.3d 760, 2003-Ohio-2550.]

Court of Appeals of Ohio,
Third District, Logan County.

No. 8–02–43.

Decided May 19, 2003.

762

764

Gerald L. Heaton, Logan County Prosecuting Attorney, and Eric C. Stewart, Assistant Prosecuting Attorney, for appellee.

Marc S. Triplett, for appellant.

SHAW, Judge.

{¶ 1} The appellant, Danny R. Dixon Sr., appeals from the November 19, 2002 judgment of conviction and sentencing of the Common Pleas Court of Logan County, Ohio.

{¶ 2} Danny Dixon Sr., and his wife, Mary Dixon, were each indicted on May 14, 2002, for two counts of permitting drug abuse in violation of R.C. 2925.13(B), both fifth degree felonies. These charges stemmed from two occurrences in November 2001, wherein the appellant's son, Danny Dixon Jr., sold marijuana from his father's home, which his father shared with Mary, to an informant for the Bellefontaine Police Department ("BPD"), who was wearing a wire at the time of the two sales. The trial court consolidated the couple's cases, and the matter proceeded to a two-day jury trial on September 26–27, 2002.

{¶ 3} During the trial, the state presented the testimony of the informant, Roger Stiles, regarding what transpired during the two sales, as well as the recordings of these two transactions. In addition, Danny Dixon Sr. testified, against the advice of counsel, on his own behalf. Dixon testified that he used marijuana for 28 years, that he was previously convicted of possession of drugs after a search of his home on May 4, 2000, but that this conviction was reversed because the police did not properly knock and announce before entering his home,[1] and that he smoked marijuana in the bedroom of his home at times. On

---

1. See State v. Dixon (2001), 141 Ohio App.3d 654, 752 N.E.2d 1005.

cross-examination, Dixon conceded that during the May 4, 2000 search of his home, the police recovered nearly one pound of marijuana, rolling papers, hand-held scales, a list of names, which the police suspected were drug customers, and numerous sandwich bags from his bedroom.

{¶ 4} Both Dixon and his wife were found guilty on each count of their respective indictments and sentenced accordingly. This appeal followed, and the appellant now asserts seven assignments of error.

"The trial court erred when it admitted the portions of the audio tapes, State's Exhibits 2 and 3, which purportedly memorialized the November 13th and 15th purchases of marijuana.

"The trial court erred when it admitted the portions of the audio tapes, State's Exhibits 2 and 3, which memorialized the debriefing of the felon-informant.

"The trial court erred when it admitted the double hearsay statement of Danny Dixon, Jr. that 'My dad told me, "Where's the fifty?" '

"The trial court erred when it permitted the felon-informant to testify as to the drug transactions.

"The prosecutors' misconduct deprived appellant of a fair trial.

"The actions of the attorney who represented appellant at trial deprived him of his right to the effective assistance of counsel.

"The cumulative effect of the errors occurring at appellant's trial deprived him of a fair trial."

### First Assignment of Error

{¶ 5} In his first assignment of error, Dixon asserts that the trial court improperly admitted the audiotapes of the two controlled drug buys that occurred in his home. Dixon bases this assertion on what he contends is the limited evidentiary value of these tapes, which was outweighed by the unfair prejudice to him by their admission. This court's analysis of this issue begins by noting that "[t]he decision of whether or not to admit evidence rests in the sound discretion of the [trial] court[.]" *Wightman v. Consolidated Rail Corp.* (1999), 86 Ohio St.3d 431, 437, 715 N.E.2d 546, citing *Peters v. Ohio State Lottery Comm.* (1992), 63 Ohio St.3d 296, 299, 587 N.E.2d 290; see, also, *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 510 N.E.2d 343. Thus, this court will not disturb the trial court's decision unless it is unreasonable, arbitrary, or capricious. In addition, this abuse of discretion must have materially prejudiced the defendant. *State v. Lowe* (1994), 69 Ohio St.3d 527, 532, 634 N.E.2d 616, citing *State v. Maurer* (1984), 15 Ohio St.3d 239, 265, 15 OBR 379, 473 N.E.2d 768.

{¶ 6} In the present case, the testimony involving the audiotapes revealed the following. On the two dates in question, Stiles was searched prior to being wired,

and the officers found that he had no drugs or money on his person. He was then provided money by the BPD and wired. The tapes recorded the sounds of Stiles's walking to the Dixon home, what transpired therein during the two respective purchases, and Stiles's walking back to the rendezvous point with officers from the BPD. After Stiles returned to the officers, he was debriefed by Officer Brandon Standley about what exactly had happened during the controlled buys. These debriefings were also recorded on the tapes.

{¶ 7} The Ohio Supreme Court has determined that "[t]o be admissible, a tape recording must be 'authentic, accurate and trustworthy.'" *State v. Coleman* (1999), 85 Ohio St.3d 129, 141, 707 N.E.2d 476, quoting *State v. Rogan* (1994), 94 Ohio App.3d 140, 640 N.E.2d 535. Dixon does not contest the authenticity or accuracy of the tapes, which were provided through the testimony of both Stiles, who was present during the buys and interpreted the tapes' contents, and Officer Standley, who wired Stiles and listened to the transactions as they occurred. Rather, Dixon challenges the trustworthiness of the tapes. Dixon contends that the unintelligible portions of the tapes were substantial to the point of rendering the tapes untrustworthy. In addition, Dixon maintains that the tapes provided little to no evidence that would make his involvement more or less probable than it would be without the tapes. To the contrary, he asserts that the prosecution used these tapes to give credibility to Stiles, who was not otherwise credible. Thus, he asserts that the jury was misled by these tapes because they did not contain information that would independently implicate him.

{¶ 8} Whether to admit tape recordings that are partly inaudible rests within the sound discretion of the trial court. *Coleman*, 85 Ohio St.3d at 141, 707 N.E.2d 476; see, also, *State v. Gotsis* (1984), 13 Ohio App.3d 282, 283, 13 OBR 346, 469 N.E.2d 548; *United States v. Haldeman* (C.A.D.C.1976), 559 F.2d 31(tape with unexplained gap held admissible); *United States v. Slade* (C.A.D.C. 1980), 627 F.2d 293, 301 (tapes are admissible unless inaudibility renders tape as a whole untrustworthy). In *Coleman*, the Supreme Court held that "recorded tapes of actual events, such as street drug sales, should be admissible despite audibility problems, background noises, or the lack of crystal clear conversations, since they directly portray what happened." *Coleman*, 85 Ohio St.3d at 141, 707 N.E.2d 476, citing *State v. Rodriquez* (1990), 66 Ohio App.3d 5, 15–16, 583 N.E.2d 384. Further, "[a]n authenticated tape is 'much more likely to be free from error than the words of a witness testifying from memory.'" *Coleman*, 85 Ohio St.3d at 141–142, 707 N.E.2d 476, quoting *State v. James* (1974), 41 Ohio App.2d 248, 250, 70 O.O.2d 456, 325 N.E.2d 267.

{¶ 9} Given their undisputed authenticity, the trial court did not abuse its discretion in admitting the tapes despite audibility problems. Stiles, who was present during these taped transactions, testified at trial as to what was

occurring on the tapes in order to make them more understandable. In addition, the officer who directly heard the recordings as they occurred also testified. Dixon had ample opportunity to fully cross-examine these witnesses, "thereby clarifying any problems caused by poor quality, * * * as well as the opportunity to offer his version of the inaudible portions[.]" *Rogan,* 94 Ohio App.3d at 149, 640 N.E.2d 535; see, also, *Coleman,* supra. Further, the tapes display what actually transpired, which was supported by Stiles's testimony.

{¶ 10} Although Dixon maintains that these tapes, when listened to by themselves, contain *almost* no evidence, they do support the testimony provided by Stiles and Officer Standley. Therefore, the trial court did not abuse its discretion in admitting the recordings of the actual transactions. Finally, any error relating to admitting the tapes did not prejudice Dixon's substantial rights as he was afforded the opportunity to cross-examine Stiles, challenge what actually transpired during these recordings, and even used the evidence contained on the tapes to portray a different scenario, one more favorable to him, of what transpired on these two occasions. Accordingly, the first assignment of error is overruled.

## Second Assignment of Error

{¶ 11} Dixon maintains in his second assignment of error that the trial court erred in admitting the debriefing portions of the aforementioned audiotapes. In support of this argument, Dixon asserts that these portions of the tapes were hearsay, which is not generally admissible at trial, and did not qualify under the present-sense-impression exception to the hearsay rule as the trial court determined. Once again, we note that "the decision of whether or not to admit evidence rests in the sound discretion of the [trial] court," and we will not disturb that decision absent an abuse of that discretion. *Wightman,* 86 Ohio St.3d at 437, 715 N.E.2d 546, citing *Peters,* 63 Ohio St.3d at 299, 587 N.E.2d 290. Additionally, this abuse must have materially prejudiced Dixon. See *Lowe,* 69 Ohio St.3d at 532, 634 N.E.2d 616, citing *Maurer,* 15 Ohio St.3d at 265, 15 OBR 379, 473 N.E.2d 768.

{¶ 12} The Rules of Evidence prevent the admission of hearsay evidence. Evid.R. 802. However, the Rules also provide several exceptions to the hearsay rule. See Evid.R. 803, 804, and 807. Included among these listed exceptions is a present sense impression, which is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Evid.R. 803(1). "The principle underlying this hearsay exception is the assumption that statements or perceptions, describing the event and uttered in close temporal proximity to the event, bear a high degree of

trustworthiness." *Cox v. Oliver Machinery Co.* (1987), 41 Ohio App.3d 28, 35, 534 N.E.2d 855; see, also, *State v. Wages* (1993), 87 Ohio App.3d 780, 787, 623 N.E.2d 193. In addition:

> "The key to the statement's trustworthiness is the spontaneity of the statement, either contemporaneous with the event or immediately thereafter. By making the statement at the time of the event or shortly thereafter, the minimal lapse of time between the event and statement reflects an insufficient period to reflect on the event perceived—a fact which obviously detracts from the statement's trustworthiness." *Cox,* 41 Ohio App.3d at 35–36, 534 N.E.2d 855.

{¶ 13} In the case sub judice, Dixon contends that Stiles's statements during the debriefing were not trustworthy because the walk from his home to the rendezvous point was sufficient for Stiles to reflect on the event and fabricate his account. We disagree. First, the statement was made immediately after the controlled buys, Stiles having taken only a few minutes to reach the officers. In addition, the actual sequence of events during the buys as heard on the tapes adds support to Stiles's statements during the debriefing because his recitation coincided with what was on the tapes. Given the close temporal proximity of the debriefings to the buys and the recordings of the buys themselves, there is a high degree of trustworthiness to these statements. Further, Stiles testified during the trial about both the buys and the debriefings, as did Officer Standley. Thus, any error that may have occurred was not prejudicial because Dixon was afforded ample opportunity to cross-examine these witnesses in order to challenge their credibility. Therefore, the trial court did not err in admitting these portions of the audiotapes, and the second assignment of error is overruled.

### Third Assignment of Error

{¶ 14} Dixon next challenges the admissibility of a statement made by his son, Danny Dixon Jr., that was recorded on the audiotape of the second controlled buy. After Stiles was given the marijuana by Danny Jr. on the second controlled buy, he left the Dixon home alone. As he was walking away, Danny Jr. emerged from the home and yelled to Stiles to wait for him. Danny Jr. then approached him and stated, "My dad said, 'Where's the fifty?'" Stiles realized that he had forgotten to pay him 50 dollars, the agreed price for the amount of marijuana he was given. He paid Danny Jr. the requested amount and then proceeded to the rendezvous point.

{¶ 15} During the trial, Dixon objected to the admission of this statement. However, the court determined that this statement qualified as an excited utterance, one of the exceptions to the hearsay rule. See Evid.R. 803(2). To the contrary, Dixon asserts that this statement was not excited, but, rather, was part

of a regularly occurring business transaction. Additionally, he challenges the trustworthiness of this statement based upon the state's position that Danny Jr. was a "doper" who made this statement to a twice convicted felon. Further, Dixon argues that the admission of this statement violated his Sixth Amendment right of confrontation because Danny Jr., the declarant, fled the jurisdiction and did not testify at the trial.[2]

{¶ 16} As previously noted, decisions of admissibility rest within the trial court's sound discretion and will not be reversed absent an abuse of that discretion. There is a strong line of federal cases establishing that a valid exception to the hearsay rule, such as an excited utterance, does not violate an accused's confrontation rights. *State v. Fowler* (1985), 27 Ohio App.3d 149, 152, 27 OBR 182, 500 N.E.2d 390, citing *Mattox v. United States* (1895), 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409; *Dutton v. Evans* (1970), 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213; *California v. Green* (1970), 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489; *United States v. Kelly* (C.A.2, 1965), 349 F.2d 720. Evid.R. 803(2) defines the term "excited utterance" as "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The standard for the excited utterance exception is as follows:

> "To be admissible under Evid.R. 803(2) as an excited utterance, a statement must concern 'some occurrence startling enough to produce a nervous excitement in the declarant,' which occurrence the declarant had an opportunity to observe, and must be made 'before there had been time for such nervous excitement to lose a domination over his reflective faculties.'" *State v. Simko* (1994), 71 Ohio St.3d 483, 490, 644 N.E.2d 345, quoting *State v. Huertas* (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058; see, also, *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140, paragraph two of the syllabus.

{¶ 17} Here, the statement by Danny Jr. was made as a result of discovering that he had just given drugs to a known drug user without receiving payment. In addition, not only did he forget to obtain the 50 dollars, he also had to be reminded of this oversight by his *father*. While Dixon maintains that a drug sale by someone with much experience in the drug trade is not a startling occurrence, the state does not contend that this was the startling event. Rather, the startling occurrence was the giving away drugs without being paid. We agree.

{¶ 18} Common sense would indicate that when any merchant is not paid by a customer who leaves with his merchandise, this is a startling event sufficient to produce a nervous excitement in the merchant. This would likely be especially so

---

2. Interestingly, Dixon testified at trial that he knew where his son was. However, he did nothing to aid in procuring his appearance so that he might assist his father's defense.

when the merchandise is illegal contraband such as marijuana, as the seller cannot readily contact the police to help him regain his drugs. Thus, the trial court did not abuse its discretion in determining that a startling event occurred when the informant left the Dixon home with marijuana without first paying Danny Jr.

{¶ 19} In addition, the evidence before the trial court revealed that Danny Jr., the declarant, quickly came out of the Dixon home upon realizing his mistake. Thus, a finding that he did not have sufficient time for such nervous excitement to lose domination over his reflective faculties was not unreasonable. Furthermore, although the trustworthiness of the declarant was somewhat questionable given his illegal dealings, the circumstances surrounding this statement render his statement inherently reliable, i.e., there was no evidence that Danny Jr. would have any reason to lie about what his father had asked him, given the situation. See *Lilly v. Virginia* (1999), 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117.

{¶ 20} Last, any error in the admission of this statement was harmless. Stiles testified that Dixon was present during the two pertinent transactions, was in very close proximity to his son and Stiles during these transactions, and partially witnessed the drug sales. Dixon's location in relation to the place in the home where the sales occurred was corroborated on at least one of the audiotapes. On this tape, Dixon's voice is highly audible, providing circumstantial evidence that he was close to his son and Stiles during the sale. Moreover, the evidence of the contraband seized during the May 4, 2000 search of the Dixon home and Dixon's own testimony regarding his extensive familiarity with marijuana further supported a finding of guilt by providing evidence of both his knowledge and his permission of the drug sales regardless of the admission of Dixon's statement to his son during the second transaction. Given the above facts, the trial court did not err in admitting the statement of Danny Jr. that his father, the accused, asked him, "Where's the fifty?" Therefore, the third assignment of error is overruled.

## Fourth Assignment of Error

{¶ 21} In his fourth assignment of error, Dixon contends that the trial court erred in permitting the testimony of Stiles. In support of this contention, Dixon argues that the tapes of the two transactions were the best evidence, and, as such, Stiles's testimony should have been excluded pursuant to Evid.R. 1002. Dixon further asserts that Stiles's testimony constituted a needless presentation of cumulative evidence in violation of Evid.R. 403(B). Once again, our discussion of this issue begins by noting that we review the trial court's admission of this testimony under an abuse-of-discretion standard. Additionally, we note that Dixon did not object to the admission of this testimony during the trial, and, as

such, has waived all but plain error. In order to find plain error, Crim.R. 52(B) requires that there must be a deviation from a legal rule, the error must be an "obvious" defect in the trial proceedings, and the error must have affected a defendant's "substantial rights." *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id.

{¶ 22} Evid.R. 1002, the best evidence rule, states: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required[.]" Dixon maintains that the tape was the best evidence of the two marijuana sales, thus precluding Stiles's testimony. However, " '[w]here proof of a conversation has been of two different kinds, namely, a recording thereof and testimony by witnesses who overheard it, * * * courts have not relegated either to a secondary position, but have held that both types of evidence are equally competent primary evidence, and that one is not to be excluded because of the existence of the other.' " *State v. James* (1974), 41 Ohio App.2d 248, 250, 70 O.O.2d 456, 325 N.E.2d 267, quoting 29 American Jurisprudence 2d 496, Evidence, Section 436; see, also, *People v. Kulwin* (1951), 102 Cal.App.2d 104, 226 P.2d 672 (holding that the testimony of a witness testifying from memory is not rendered inadmissible by the existence of a record of what was heard); *Kilpatrick v. Kilpatrick* (1937), 123 Conn. 218, 193 A. 765 (holding that both mechanical recordings and the testimony of a witness whose memory was refreshed thereby were properly admitted). Based on this line of cases regarding the best evidence rule, no error occurred in admitting Stiles's testimony.

{¶ 23} In addition, Evid.R. 403(B) provides a trial court with discretion in prohibiting the admission of evidence if it constitutes the needless presentation of cumulative evidence. Here, the evidence was not needlessly cumulative. Rather, Stiles's testimony served to aid the jury in understanding what was occurring at various points on the tapes. Likewise, the tapes supported his testimony. Thus, the two went hand-in-hand in helping to convey to the jury what occurred during the two buys. Therefore, Stiles's testimony was admissible, and no error, plain or otherwise, occurred. Accordingly, the fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶ 24} In his fifth assignment of error, Dixon claims that improper statements by the prosecutor during closing arguments denied him a fair trial. To address this argument, this court must first determine whether the prosecutor's remarks were improper; if so, we then consider whether the remarks prejudicially affected Dixon's substantial rights. *State v. Smith* (1984), 14 Ohio

St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. We evaluate the allegedly improper statements in the context of the entire trial. *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203. "An improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749, citing *Smith,* 14 Ohio St.3d at 15, 14 OBR 317, 470 N.E.2d 883. To reverse a conviction based on prosecutorial misconduct, the alleged misconduct must have deprived the defendant of a fair trial. *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136; *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 473 N.E.2d 768. Thus, the touchstone of this analysis is whether the trial was fair, not the prosecutor's culpability. *Smith,* 14 Ohio St.3d at 15, 14 OBR 317, 470 N.E.2d 883, citing *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. However, while the prosecution may strike hard blows, it may not strike foul ones. *Smith,* 14 Ohio St.3d at 15, 14 OBR 317, 470 N.E.2d 883.

{¶ 25} Dixon contends that the prosecution erred in numerous ways. First, he maintains that the prosecution had a vendetta against him because he "got away" when his prior conviction for possession of drugs was reversed by this court. This argument is wholly without merit, as the motivations of the state are not relevant to the prosecution of the case sub judice. Whatever the prosecutor's motives may have been is mere conjecture by the defense and have nothing to do with Dixon's guilt or innocence. Moreover, the testimony of the informant, combined with the audiotapes, provided an adequate basis for the state to pursue a case against Dixon for permitting drug abuse, as evidenced by the indictment issued against him by the grand jury.

{¶ 26} Dixon next contends that the state engaged in prosecutorial misconduct during its opening statement. Initially we note that Dixon's trial counsel never objected to these statements. Thus, Dixon has waived all but plain error. See Crim.R. 52(B). As previously noted, "[a]n alleged error 'does not constitute a plain error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise.'" *State v. Stojetz* (1999), 84 Ohio St.3d 452, 455, 705 N.E.2d 329, quoting *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 27} The assistant prosecutor began his opening statement by informing the jury that he is typically assigned to juvenile court and that one of the biggest problems he faces in attempting to rehabilitate juveniles is having to send these children back home to the environment that helped create the juvenile's delinquency problem. Specifically, the assistant prosecutor stated:

"When we have to send juveniles back to homes where drugs are sold or drugs are abused or abuse happens, those kinds of things, it is very difficult to get a juvenile to turn his life around when he has these influences at home and that he does not have that moral compass to guide him to help him become a better citizen. And that's one of the greatest frustrations that we have in juvenile court. That's why the State gets involved in what goes on in people's homes."

{¶ 28} Dixon maintains that these comments constituted an attempt to impassion the jury to convict him as an effort "to cure the ills of society." In a criminal prosecution, the state is not permitted to ask the jury to convict in response to public demand, commonly known as the "send a message" argument. See *State v. Hicks* (1989), 43 Ohio St.3d 72, 76, 538 N.E.2d 1030, citing *State v. Davis* (1978), 60 Ohio App.2d 355, 361–362, 14 O.O.3d 315, 397 N.E.2d 1215. The comments by counsel for the state provide a classical example of an attempt to impassion the jury in an effort to encourage them to "send a message" to Dixon. Thus, these comments were inappropriate. However, the prosecutor's argument must be reviewed as a whole. *State v. Burgun* (1978), 56 Ohio St.2d 354, 366, 10 O.O.3d 485, 384 N.E.2d 255. For instance, a bribery conviction was upheld by the Ohio Supreme Court although the prosecutor told the jury that, by convicting, it would " 'put all corrupt police officials, public officials on notice that this community will not stand for this kind of activity.' " *State v. Moritz* (1980), 63 Ohio St.2d 150, 157, 17 O.O.3d 92, 407 N.E.2d 1268.

{¶ 29} In viewing the argument as a whole, the court held "that the quoted passage was premised upon an establishment of the guilt of appellant." Id. at 158, 17 O.O.3d 92, 407 N.E.2d 1268. Likewise, the remainder of the prosecutor's opening statement centered upon an establishment of guilt of Dixon based upon the evidence presented as evidenced in his final statement: "You'll get to listen to those tapes. Listen closely to them, and then based on those facts the facts that we present to you, you should be able to come back with a verdict of guilty." In addition, the inappropriate statements did not substantially prejudice Dixon's rights. Given the aforementioned evidence, there was ample support for the jury to find Dixon guilty of two counts of permitting drug abuse beyond a reasonable doubt. Therefore, the inappropriate comments made by the prosecution do not merit reversal of this case.

{¶ 30} Dixon next contends that the prosecutor engaged in misconduct during cross-examination of him. During direct examination, Dixon testified that his home was searched on May 4, 2000, that marijuana that belonged to him, was recovered, that he was convicted of possession of drugs based on this search, and that this conviction was subsequently reversed. Dixon further testified that he smoked marijuana for 28 years, including in his home, but that he went to counseling and had since recovered. In addition, he testified that he did not

allow his children to sell marijuana in his home and that they did not smoke it with him.

{¶ 31}   During cross-examination, the state elicited testimony that the police recovered nearly one pound of marijuana, scales, cash, and a list of names during the search.   Dixon was also asked whether the list of names was customers, implying that he was a drug dealer.   Further, Dixon was asked whether he sold drugs, to which he answered in the negative.   The prosecution then asked Dixon why his wife would have told the authorities that she knew that he sold drugs for six to nine months, to which he responded, "Only thing I can figure is they had her scared to death."   In addition, the prosecution was permitted to produce the marijuana seized from Dixon's home on May 4, 2000, for the jury to view over the objection of defense counsel.   However, neither the marijuana nor his wife's statement was admitted into evidence.

{¶ 32}   Here, the trial court ruled prior to trial that the evidence of the May 4, 2000 search would be permitted for impeachment purposes only if either Dixon or his wife, the codefendant, opted to testify.   Dixon chose to testify over the advice of his counsel, who then introduced Dixon's testimony as to the search.   Dixon now asserts that Evid.R. 609 prohibited questioning on anything regarding his prior conviction other than the nature of the conviction and the time and place.   However, his own testimony regarding the search and whether he allowed Danny Jr. to sell drugs from his home opened the door for the state to inquire as to his knowledge about marijuana sales and, more specifically, to use this to demonstrate that he knew that his son was selling drugs from his home.   Thus, this line of questioning and the demonstrative use of the marijuana seized from Dixon's home did not constitute prosecutorial misconduct.

{¶ 33}   Dixon also challenges the use of the statement of Dixon's codefendant, his wife, Mary. As previously noted, the prosecutor asked Dixon why his wife would have told the police that she knew that he sold marijuana. This was a clear violation of the *Bruton* rule.   See *Bruton v. United States* (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.   In *Bruton*, the Supreme Court held that any statements made by a nontestifying codefendant that inculpates an accused are a violation of the accused's Sixth Amendment right to confront his accusers, and such statements should be excluded from evidence. Id. at 137, 88 S.Ct. 1620, 20 L.Ed.2d 476.   The Ohio Supreme Court has further explained that "[t]he *Bruton* rule applies with equal force to all statements that tend significantly to incriminate a co-defendant, whether or not he is actually named in the statement."   (Internal citations omitted.)   *Moritz*, 63 Ohio St.2d at 153, 17 O.O.3d 92, 407 N.E.2d 1268.   However, a violation of the *Bruton* rule " 'does not automatically require reversal of the ensuing criminal conviction.   In some cases the properly admitted evidence of guilt is so overwhelming, and the

prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.'" Id. at 156, 17 O.O.3d 92, 407 N.E.2d 1268, quoting *Schneble v. Florida* (1972), 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340. Thus, pursuant to *Moritz,* a violation of the *Bruton* rule is not prejudicial where there is sufficient independent evidence of an accused's guilt to render improperly admitted statements harmless beyond a reasonable doubt. *Moritz,* 63 Ohio St.2d at paragraph two of the syllabus.

{¶ 34} The questioning regarding Mrs. Dixon's statement that her husband sold drugs tended significantly to incriminate him in the present action. This statement provided direct evidence that he sold drugs, which could lead to a logical inference that he knowingly permitted his son to likewise do so. Thus, her statement aided in incriminating her husband in the present action. However, given the evidence provided by Stiles, the audiotapes, Danny Jr.'s statement that his father asked, "Where's the fifty?" and Dixon's own admissions regarding his familiarity with marijuana, the prejudicial effect of her statement was so insignificant by comparison that it is clear beyond a reasonable doubt that the improper use of her statement was harmless error.

{¶ 35} Last, Dixon contends that the state engaged in misconduct during closing argument by making statements regarding matters not in evidence. Dixon complains that the prosecutor improperly stated that Dixon was aware of his son's lifestyle of using drugs and selling drugs with his brothers and that Dixon allowed this to occur in his home. In addition, Dixon asserts that the state committed prosecutorial misconduct by stating that Dixon exposed his family to the drug culture and that his children learned how to deal drugs from him. However, as previously noted, Dixon's own testimony revealed that he smoked marijuana for 28 years, admittedly in his own home while his children were present.

{¶ 36} During summation, a prosecutor has "wide latitude" in stating what the evidence shows, the reasonable inferences that may be drawn from it, and may comment on those inferences during closing argument. *State v. Smith* (1997), 80 Ohio St.3d 89, 111, 684 N.E.2d 668. However, that latitude does not "encompass inviting the jury to reach its decision on matters outside the evidence adduced at trial." *State v. Hart* (1994), 94 Ohio App.3d 665, 672, 641 N.E.2d 755.

{¶ 37} Although Dixon testified that his children did not know that he smoked marijuana in his bedroom and that he used aerosol spray to rid the room of the odor of marijuana, the length of his time of use and the contraband seized from his home during the May 4, 2000 search, of which even his son's friends were aware, as Matthew Miller testified to while testifying on Dixon's behalf, indicated

otherwise. This evidence provided the prosecution with a sufficient basis with which to draw a reasonable inference that he exposed his family to the drug culture. Further, the amount of marijuana, the scales, the baggies, and the list of names recovered from Dixon's home, which he could not explain, coupled with Danny Jr.'s sale of the marijuana and the statement, "My dad said, 'Where's the fifty?'" also provided the prosecution with sufficient evidence from which it could draw the reasonable inference that Dixon was aware that his son sold drugs, that he allowed his son to sell marijuana in his home, and that his son learned how to do so from him. Thus, the state did not engage in misconduct by making these comments during closing. For these reasons, this assignment of error is overruled.

### Sixth Assignment of Error

{¶ 38} In his sixth assignment of error, Dixon asserts that he received ineffective assistance of counsel. This court has previously addressed the issue of ineffective assistance of counsel when a trial has taken place and has determined that courts must consider "'whether the accused, under all the circumstances * * * had a fair trial and substantial justice was done.'" *State v. Jones* (Sept. 27, 2000), Auglaize App. No. 02–2000–07, 2000 WL 1420271, at * 2, quoting *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289, 714 N.E.2d 905. In addition, attorneys licensed by the state of Ohio "are presumed to provide competent representation." *Jones,* supra, citing *State v. Hoffman* (1998), 129 Ohio App.3d 403, 407, 717 N.E.2d 1149.

{¶ 39} The state of Ohio has also adopted the two-part test for determining whether a criminal defendant has been denied the effective assistance of counsel established by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. "A convicted defendant must first show that his attorney's performance 'fell below an objective standard of reasonableness,' and must then show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones,* supra, quoting *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. As to the first prong of the test, courts are to afford a high level of deference to the performance of trial counsel. *Bradley,* 42 Ohio St.3d at 142, 538 N.E.2d 373. The second prong regarding reasonable probability requires a probability sufficient to undermine the confidence in the outcome of the trial. Id.

{¶ 40} Dixon first maintains that his counsel was ineffective for not having objected to the improper comments made by the prosecution during his opening statement regarding problems in the juvenile justice system. While we

agree that these statements were inappropriate as previously discussed, counsel elected to use these statements in his own opening statement regarding his experience in the juvenile court system. Counsel chose to discuss how his experience as an attorney in that system has been that the courts do not send a child back to his parents until his parents receive counseling and "jump through a whole series of hoops."

{¶ 41} The Ohio Supreme Court has held that a reviewing court should not "second-guess trial strategy decisions, and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Mason* (1998), 82 Ohio St.3d 144, 157–158, 694 N.E.2d 932, quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674; see, also, *State v. Bey* (1999), 85 Ohio St.3d 487, 493, 709 N.E.2d 484. Here, the decision not to object to the prosecutor's statement and then to juxtapose the prosecutor's experience with that of his own was a strategic decision on the part of defense counsel. The choice to counter this argument and to use it to Dixon's advantage rather than object was a reasonable decision, which did not constitute ineffective assistance of counsel.

{¶ 42} Dixon next contends that his trial counsel was ineffective for not having objected to the testimony of Officer Standley, who testified that Stiles successfully purchased drugs on five to ten other occasions, because this testimony was not relevant and impermissibly gave credibility to an otherwise unreliable source. Once again, the choice not to call attention to this particular testimony and hope the moment passed was a reasonable matter of judgment and strategy rather than ineffective assistance. Had counsel objected to this testimony, the result may very well have been to emphasize the informant's credibility in the eyes of the jury.

{¶ 43} Dixon also contends that trial counsel was ineffective by failing to object to Stiles's testimony that he had purchased marijuana from Danny Jr. on several prior occasions, which was not relevant. However, this testimony was relevant in that it provided the jury with information on how Stiles knew where to purchase marijuana and how he came to be inside the Dixon home. Moreover, his testimony that Danny Jr. had been his supplier for several years, including during the May 4, 2000 search, was relevant in that it aided in the determination of whether Dixon knew that his son was selling marijuana from his home. Thus, the decision not to object to this admissible testimony and not to call more attention to it was a reasonable trial strategy and did not amount to ineffective assistance.

{¶ 44} The next assertion made by Dixon is that his counsel was ineffective during his case-in-chief by having Matthew Miller testify on behalf of

Dixon. However, Dixon admits that Miller provided testimony that was helpful to his case. Specifically, Miller testified that Stiles had a reputation of a liar and a thief, that he was often at the Dixon home visiting their children and had not witnessed Danny Jr. ever sell drugs although they frequently smoked marijuana together, and that Stiles had been untruthful when he testified that Miller was in the home during the two pertinent drug transactions. In addition, Miller testified that he believed that Dixon was unaware of his sons' drug use because the boys had to "sneak around" in order to smoke and that they never smoked marijuana in the Dixon home.

{¶ 45} Clearly, the decision to have Miller testify was a form of trial strategy aimed at bolstering the defense's position that Dixon did not knowingly permit his son to sell drugs in his home. Although the prosecution was able to elicit testimony that his father forbade him from going to the Dixon home after the May 4, 2000 search and that Stiles may have been correct when he testified that Miller was present in the Dixon home during the two sales, the strategic decision to have Miller testify is not negated. Thus, this representation was not ineffective.

{¶ 46} Dixon further contends that counsel was ineffective by opening the door to the state to present evidence of the prior search when counsel questioned him about that search during direct examination, which would not have been permitted otherwise. Specifically, Dixon asserts that preventing the evidence of the prior search from entering this trial was critical to Dixon's defense in this case because of the damaging information that Dixon was highly familiar with marijuana, and, more particularly, kept it in his home.

{¶ 47} Here, trial counsel faced a difficult decision. As previously noted, before the state commenced its case-in-chief, the trial court ruled that evidence of the prior search would be permitted if either defendant chose to testify. Accordingly, the only absolute method to keep this information from the jury was by not having either defendant testify. Dixon chose to testify in his own defense, knowing the trial court's ruling on the issue of the prior search. In addition, counsel specifically advised Dixon not to testify and went so far as to place this information on the record. Thus, Dixon's own desires placed him in a position of vulnerability, as his credibility was a proper subject for cross-examination. See Evid.R. 611(B). However, Dixon now asserts that his defense was that the informant incorrectly testified that Dixon was present during the two drug sales as evidenced by the informant's incorrect description of the home's interior, which meant that the prior search would not be permitted during cross-examination. We disagree.

{¶ 48} Dixon's voice is clearly heard on the audiotape of the first controlled buy, so challenging his presence at this buy was not a particularly viable option.

Also, the state did not have to prove that Dixon was actually present during the buys, but, rather, that he knowingly permitted his son to conduct these transactions. Further, both Stiles's testimony and Danny Jr.'s statement placed Dixon at the home during the second buy. Last, Dixon's knowledge was at issue. Any testimony by him that he did not know that these sales were occurring was subject to a credibility challenge, which included demonstrating his knowledge by proving his familiarity with drugs, the use of it in his home, and the inference that he sold it.

{¶ 49} Given the great likelihood that the evidence of the prior search would come out during cross-examination, trial counsel elected to deal with this negative information up front. Being candid with the jury about this past problematic issue rather than avoiding it until the prosecution introduced it was a far more likely method to win the jury's trust. Additionally, this choice afforded the defense an opportunity to tell the jury that Dixon was now drugfree and had been for quite some time, as well as providing him with the chance to inform the jury that his conviction was reversed. Thus, by electing to be forthcoming with this information, counsel had the first opportunity to paint a picture for the jury in a light favorable to Dixon, which also eliminated any possible negative effect that the prosecution may have been able to create by first introducing this information during cross-examination. Therefore, faced with a client who refused to follow his advice, counsel made a strategical choice that was reasonable under the circumstances. For all these reasons, the sixth assignment of error is overruled.

### Seventh Assignment of Error

{¶ 50} Dixon next asserts that the cumulative effective of the errors that occurred at trial denied him a fair trial. We disagree. Given our discussion of the six previous assignments of error, we find that very few errors occurred at trial, none of which was unduly prejudicial. Even the cumulative effect of the few errors that occurred was not outcome-determinative based upon the evidence adduced at trial. Therefore, the seventh assignment of error is overruled.

{¶ 51} For these reasons, the judgment of the Common Pleas Court of Logan County, Ohio, is affirmed.

Judgment affirmed.

WALTERS and CUPP, JJ., concur.