DECISION.
{¶ 1} "It is as much the duty of the prosecutor to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."[1] The prosecutor in this case may have violated the first part of that duty. But because the record shows that the trial was fair, we must affirm.
 {¶ 2} Defendant-appellant Lionel Grimes appeals his conviction for murder. While the prosecutor's closing statements were highly improper, they did not deny Grimes a fair trial.
 I. A Birthday Celebration Turns Deadly {¶ 3} In April 2003, Kevin Benford Jr., also known as "Woda," had a large party to celebrate his 16th birthday at Fay's Market in Millvale, Ohio. His father, Kevin Benford Sr., and other family members had made the arrangements and had put up fliers at several area schools inviting people to the party. (We refer to Benford Jr. as "Woda" and Benford Sr. as "Benford.") Somewhere between 65 and 100 people showed up. Benford and others searched people when they arrived, making sure that nobody brought weapons. Unfortunately, that did not prevent some individuals from bringing their weapons to the party and leaving them hidden in the parking lot.
 {¶ 4} The party seemed to be going well until around 11 p.m., when a shouting match erupted between residents of different neighborhoods. Benford calmed the crowd down by talking over the microphone to the partygoers.
 {¶ 5} But the real trouble was only getting started. About an hour after the first incident, the disc jockey played a song that apparently riled up the crowd once again. This time, Benford decided he needed to eject two of the boys — Timothy Steele and Kendall Miller. Steele began to leave without incident; Miller had to be escorted out. While Benford was removing Miller, a fight broke out. The fight escalated into a brawl, and Miller and Jerald Thomas retrieved their guns from the parking lot.
 {¶ 6} Jeshawn Johnson got involved in a one-on-one fight, but was soon overwhelmed by six to ten people. Johnson was a nationally ranked amateur boxer, but unfortunately his fighting skills would not help him that night. The crowd around Johnson forced him to the ground and began beating and kicking him. As this was going on, several shots rang out. Miller and Thomas were shooting their guns into the air. Grimes was also at the party and the fight, and he apparently also had a gun. The scene, as described at trial, was typical of a large fracas — there were many people involved, and most of the witnesses could not say exactly what had happened.
 {¶ 7} While Johnson was on the ground fighting, somebody shot him in the back. Johnson died because the bullet pierced his lung and his heart, filling his chest cavity with blood.
 {¶ 8} The crowd dispersed soon thereafter. Police arrived and secured the scene. Several of the boys involved in the fight were charged with aggravated riot, but most had fled from the scene by the time the police arrived.
 {¶ 9} Several months later, officers responding to an unrelated call came into contact with Grimes. One of the officers checked Grimes in the police database and discovered that there was a felony warrant for his arrest. Grimes was arrested on the spot, ostensibly for aggravated riot. But Grimes was then charged with Johnson's murder.
 II. The Case Against Grimes {¶ 10} At trial, several witnesses identified Grimes as Johnson's shooter. Some of the witnesses also said that they had heard Grimes say, "I popped him" or "I popped that nigger" immediately after Johnson was shot. The witnesses' stories differed to the degree that one would expect for a melee such as the one after Woda's party.
 {¶ 11} But some of the testimony was inconsistent — or at least questionable — for other reasons. Tiffany Ruff, Benford's sister, was also at the party. She testified at trial that she did not see Grimes do anything. But in a previous recorded statement, she had identified Grimes as the shooter. The state later introduced that taped conversation, which included allegations that Grimes's family had tried to intimidate Ruff because of her testimony. Grimes moved for a mistrial after the tape was played for the jury, but the trial court denied his motion. Ruff explained that when she had made the earlier statement, she was lying to protect Thomas, who was her boyfriend at the time.
 {¶ 12} Benford, Steele, and Curtis Holloway (who was also at the party) did not come forward with their testimony until they had their own run-ins with the law. Benford had violated his parole. Steele was arrested in connection with the riot. And Holloway was arrested for an unrelated assault.
 {¶ 13} Edreisha Humphrey, Woda's sister, testified that she also saw Grimes shoot Johnson. But she did not come forward until the day that Grimes's trial began. Woda testified that he did not see Grimes shoot Johnson.
 {¶ 14} Grimes used most of his cross-examination opportunities at trial to argue that all of these inconsistencies were enough to create a reasonable doubt in the juror's minds.
 {¶ 15} And the state responded by referring to allegations that Grimes's family had attempted to intimidate the witnesses. The state claimed that this showed why the witnesses were slow to come forward or why their stories had changed. Most of these references were fairly innocuous, save for Ruff's taped statement, which included allegations that Grimes's aunt had hit her in the head with a bottle, and that several other family members had harassed her. During closing statements, the prosecutor urged that the jury send a message to the community and to Grimes by finding him guilty.
 {¶ 16} Grimes was convicted and sentenced to 15 years' to life imprisonment. He now appeals, assigning five errors: (1) the trial court should have granted Grimes's motion for a mistrial because Ruff's taped statement unduly prejudiced the jury; (2) the trial court should not have allowed the state to repeatedly allege witness intimidation; (3) prosecutorial misconduct prejudicially affected Grimes's right to due process and a fair trial; (4) his conviction was against the manifest weight of the evidence; and (5) the cumulative effect of the errors deprived Grimes of a fair trial. While we address all of his assignments, Grimes's third assignment concerns us most, so we address it first. The state toed the line (with one foot possibly over it) of prosecutorial misconduct, but ultimately did not violate Grimes's substantial rights.
 III. Prosecutorial Misconduct {¶ 17} Grimes argues that the prosecutors' repeated allusions to witness intimidation throughout the trial and in closing argument, combined with their insistence that the jury "send a message" through its verdict, constituted an improper appeal to the sympathy and passion of the jury, and therefore denied him a fair trial. Grimes would be right but for the trial court's curative instruction and the overwhelming evidence of his guilt.
 {¶ 18} To determine whether a prosecutor's remarks at trial constituted misconduct, we must determine (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused's substantial rights.[2] The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor."[3] It must be clear beyond reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty.[4] The state is permitted and encouraged to prosecute with vigor, striking hard blows — but it may not strike foul ones.[5] Here, the prosecution crossed the line and struck a decidedly foul blow. But the trial court cured the problem. And the trial as a whole was a fair one.
 {¶ 19} In a criminal prosecution, the state is not permitted to ask the jury to find the defendant guilty in response to public demand, commonly known as the "send a message" argument.[6]
 {¶ 20} At the end of closing argument, the prosecutor overstepped the wide latitude that the state is usually granted in summarizing the case:[7]
 {¶ 21} "[Prosecutor]: Ladies and gentlemen, you can make a difference. You can send a message loud and clear back to the hood that this city is not going to tolerate this violence.
 {¶ 22} "[Defense Counsel]: Objection judge.
 {¶ 23} "[Prosecutor]: This senseless murder.
 {¶ 24} "The Court: Ladies and gentlemen, this case must be decided only on the evidence that you hear from the witness stand. It may not be decided on issues of any bias, sympathy or prejudice. You may proceed, Mr. Kunkel."
 {¶ 25} "[Prosecutor]: That the threats are not going to work. Tell these witnesses that they are good enough despite their imperfections, that they will be believed when they come into court and tell the truth. And, finally, send the message to the defendant that he is going away for a long time because he is guilty."
 {¶ 26} We note that Grimes was never accused of witness intimidation. While there was some testimony that his family may have attempted to intimidate witnesses, their acts did not reflect on Grimes's guilt or innocence in this case. Grimes never argued that witness intimidation played a role in his defense. And even if he had, that did not give the state free rein to tell the jury to send a message to the "hood."
 {¶ 27} The trial court seems to have sustained the objection by giving a cautionary instruction — it would have been better to have specifically sustained the objection and admonished the prosecutor — and it later repeated the cautionary instruction. The state argues that that cured any problem that may have arisen. Unfortunately, the court's action did not seem to have any effect on the prosecutor.
 {¶ 28} The witness-intimidation argument was not totally improper because it served to explain why the witnesses' stories had changed. But it was blatantly improper to ask the jury to "send a message to the hood." The prosecutor even continued along the same line after the court had stopped to instruct the jury not to allow sympathy to sway its decision.
 {¶ 29} We bear in mind that we must review the state's argument in the context of the whole trial, rather than taking the statements out of context.[8] We note that several previous cases in which the state had requested that the jury send a message held that, after a review of the argument as a whole, the call was premised on a finding of guilt,[9] or the state's intent was only to remind the jurors of their roles as members of a civic body.[10] Neither was the case here.
 {¶ 30} The prosecutor told the jury to send a message to the "hood" that the city was not going to tolerate violence, and that the threats against the witnesses were not going to work. This was not premised on a finding of guilt; the prosecutor asked the jury to find Grimes guilty of murder because of his involvement with a violent fight and because the witnesses had allegedly been threatened — but not by Grimes. This asked the jurors to disregard their oath to decide the case on the evidence and to return a guilty verdict for the sole purpose of sending a "message" to the community. This was highly improper.
 IV. An Unfair Trial? {¶ 31} Though improper, did the state's comments affect Grimes's substantial rights?
 {¶ 32} In Pennsylvania v. DeJesus, the Pennsylvania Supreme Court recently reviewed a case where the prosecutor had made a similar plea to the jury.[11] There, the prosecutor stated, "When you think of the death penalty, there are messages to be sent. There's a message on the street saying, look at that, he got death, you see that, honey, that's why you live by the rules, so you don't end up like that. * * * You also need to send a message in prisons." The court held that these statements were a deliberate attempt to destroy the objectivity and impartiality of the finder of fact. It also held that any request to the jury to "send a message" with its verdict was prejudicial per se and that no instruction would have cured the error. While DeJesus dealt with the penalty phase of a capital trial, we believe that the same logic applies here.
 {¶ 33} We suggest that a plea to send a message to the community, where not premised on a finding of guilt, is improper and prejudicial. But even if that were not so, a review of the state's entire closing argument, focusing mainly on the passage quoted above, shows that the state made an improper plea to the jury's sympathies and passion. We commend Grimes's trial counsel for properly objecting to, and the trial court for at least partially trying to undo the damage done by, the state's improper comments.
 {¶ 34} To affirm a conviction after improper remarks such as these, it is not enough that there may be sufficient evidence to sustain a conviction.[12] Rather, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty.[13]
 {¶ 35} Multiple witnesses testified that they saw Grimes shoot Johnson or that they heard Grimes say that he had "popped" somebody. This was overwhelming evidence of Grimes's guilt — beyond any reasonable doubt the jury would have found Grimes guilty absent the improper argument. But the overwhelming nature of the evidence, combined with the trial court's curative instruction, is all that prevented the state's improper statements from warranting a reversal. Thus the trial was fair; Grimes was guilty beyond a reasonable doubt.
 {¶ 36} We have repeatedly warned the prosecutors of this county that their comments are often improper.[14] The Ohio Supreme Court has also done so.[15] Repeatedly our warnings have fallen on closed ears.
 {¶ 37} We are sending our own message: the comments in this case were improper. And absent the overwhelming state of the evidence, these comments would have required us to reverse Grimes's conviction — mandating a costly retrial and the reliving of this crime by the victim's family. The fact that we are affirming the outcome does not make the state's remarks any less improper.
 {¶ 38} And though the concurring opinion talks of "hesitation," we will not hesitate, when there is less than overwhelming evidence of guilt, to reverse a conviction based on these types of comments. We will not approve, as that opinion seems to do, an appeal to the jury to "send a message" by finding a defendant guilty.
 {¶ 39} We overrule Grimes's third assignment.
 V. Motion for a Mistrial {¶ 40} In his first assignment, Grimes argues that the trial court improperly overruled his motion for a mistrial based on the admission of Ruff's taped statement.
 {¶ 41} A witness's prior statement is admissible where the witness testifies at trial and is subject to cross-examination, and where the prior statement is inconsistent with her testimony and was given under oath subject to cross-examination.[16] The prior statement is also admissible when it is one of identification of a person soon after perceiving him.[17] But the prosecutor may impeach the witness with her previously sworn statement by using only those portions of the statement that are inconsistent with her testimony.[18]
 {¶ 42} The granting or denying of a motion for a mistrial rests in the sound discretion of the trial court, and we will not disturb the decision absent an abuse of that discretion.[19]
 {¶ 43} Ruff's taped statement contained descriptions of her confrontations with Grimes's family, as well as speculation concerning other witnesses' possible testimony and Grimes's own refusal to give a statement. But it was introduced because in the tape Ruff identified Grimes as Johnson's shooter, which was contrary to her testimony at trial. Immediately after the tape was played, Grimes's trial counsel moved for a mistrial.
 {¶ 44} The state argued (and continues to argue) that Grimes invited this error, and that he may not now assign it as error.[20] The state claimed that Grimes's trial counsel asked for the whole tape to be played. The prosecutor stated, "I volunteered to just play the part about seeing the shooting being done by Mr. Grimes. The defense wanted the whole tape." Grimes's trial counsel denied this and later responded, "No. I said I didn't want any of it being played. And I said that you can't just pick and choose."
 {¶ 45} But the state could have and should have picked and chosen. We do not believe that Grimes invited or created this error. But we do believe that the trial court cured the error through its instruction immediately following its denial of Grimes's motion for mistrial:
 {¶ 46} "Ladies and gentlemen, in evaluating the tape that you just heard there were a lot of statements that really are somewhat irrelevant to your consideration. The tape was admitted for one purpose and one purpose only, and that is that Ms. Ruff, who has testified in this case, was admitted for prior identification. And when she made the statement back in August, she testified in a manner that you heard.
 {¶ 47} "The balance of the tape — of the statement which goes into other matters really is extraneous and should not be considered. And it was only offered for one purpose and one purpose only, and that is her prior identification back in August."
 {¶ 48} During deliberation, the jury asked the trial court how it was permitted to use Ruff's statement. Grimes now argues that that showed that the jury's question demonstrated its confusion, and that his motion for a mistrial should have been granted. But the trial court responded to the jury's question with this: "You will have the tape player and you will hear excised portions of the testimony. You may consider that testimony pursuant to the instructions given you. Hopefully that answers that question."
 {¶ 49} Unfortunately, the record on appeal does not contain the written instructions given to the jury. But as we have already mentioned, the trial court instructed the jury following Grimes's motion for a mistrial. And immediately before closing arguments, the trial court again instructed the jury, "There is also one comment that I have to indicate, there was a tape played on Monday, and that is Exhibit 12. That tape was introduced for the limited and the sole purpose of showing that Tiffany Ruff made a prior identification in this particular case. You may consider that testimony, along with her testimony that she gave in person."
 {¶ 50} The excised portion of the tape that was actually given to the jury contained only information that related to Ruff's seeing Grimes shoot Johnson and the type of gun used. The excised portion of the tape took up approximately one page of the transcript. The entire tape — which was played in front of the jury — took up 45 pages. The rest of the tape should never have been played for the jury. But this was not reversible error.
 {¶ 51} While the better response to the jury's question would have been to regive the instruction, or to explain it in different language, we are convinced that the trial court's instruction was sufficient.
 {¶ 52} The trial court's instruction was clear: the taped statement was only to be used to show Ruff's prior identification of Grimes as Johnson's shooter. Any error that arose as a result of the other portions of the taped statement being played for the jury was harmless. The trial court did not abuse its discretion when it denied Grimes's motion for a mistrial.
 {¶ 53} We therefore overrule Grimes's first assignment.
 VI. Witness Intimidation {¶ 54} In his second assignment, Grimes argues that the trial court erred by permitting the state to repeatedly allude to alleged witness intimidation by Grimes's family and friends.
 {¶ 55} Specific evidence of witness intimidation is admissible to show consciousness of guilt.[21] Ordinarily, intimidation must be shown by evidence of the defendant's specific acts to that end.[22] It was never alleged that Grimes himself attempted to intimidate any witness.
 {¶ 56} But the references to witness intimidation were not improper because they were offered to demonstrate why the witnesses' stories had changed, and why some of the witnesses had not immediately come forward to the police with information about the shooting.
 {¶ 57} The Second Appellate District faced a similar situation inState v. Carillo.[23] There, several witnesses testified that they had been afraid to testify because of the defendant's gang affiliation. But the court held, "In offering this evidence the State was attempting to bolster the credibility of those witnesses whose credibility would otherwise be suspect because they had previously lied. That is a legitimate and proper purpose for eliciting evidence of this kind * * *."
 {¶ 58} This was a difficult case for the state to prove because most of the witnesses available had changed their stories, had come forward late, or had extensive criminal records. Allowing the state to refer to the witness-intimidation allegations helped the state to show that the problem was not with the evidence, but with the witnesses' hesitance. The references to witness intimidation were not intended as references to Grimes's guilt by association.
 {¶ 59} We therefore overrule Grimes's second assignment of error.
 VII. Manifest Weight {¶ 60} In his fourth assignment, Grimes argues that his conviction was against the manifest weight of the evidence.
 {¶ 61} A review of the manifest weight of the evidence puts the appellate court in the role of a "thirteenth juror."[24] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[25]
 {¶ 62} As we have already noted, several witnesses testified that they had seen Grimes shoot Johnson. Still others heard him say that he had shot somebody. While the credibility of the witnesses was rightfully called into question by Grimes's defense counsel, their stories did not differ so much that they were materially inconsistent with each other. And while several witnesses did have their own run-ins with the law, it did not necessarily mean that they were unreliable or untrustworthy witnesses. We have reviewed the entire record, and we cannot say that the jury lost its way in finding Grimes guilty.
 {¶ 63} We therefore overrule Grimes's fourth assignment of error.
 VIII. Cumulative Effect {¶ 64} In his final assignment, Grimes argues that the cumulative effect of the errors below denied him a fair trial. Grimes is mistaken.
 {¶ 65} A conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial.[26] And when considered together, errors that are separately harmless may violate a defendant's right to a fair trial.[27]
 {¶ 66} We have already stated that there were two errors at trial — namely, the admission of certain portions of Ruff's taped statement and the prosecutor's improper closing remarks. But even when these two errors are considered together, we cannot say that they denied Grimes his right to a fair trial. The evidence against Grimes was overwhelming. The trial court conducted the trial in a fair and commendable manner. Grimes received a fair trial and he was rightfully found to be guilty of Johnson's murder.
 {¶ 67} We therefore overrule Grimes's fifth assignment of error. Accordingly, we affirm the trial court's judgment.
Judgment affirmed.
Gorman, J., concurs.
Hildebrant, P.J., concurs separately.
[1] Viereck v. United States (1943), 318 U.S. 236, 63 S.Ct. 561.
[2] State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883.
[3] Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940.
[4] State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883; Statev. Treesh, 90 Ohio St.3d 460, 2001-Ohio-4, 739 N.E.2d 749; State v.Perry, 10th Dist. No. 01AP-996, 2004-Ohio-5152.
[5] See Berger v. United States (1935), 295 U.S. 78, 55 S.Ct. 629; Statev. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883.
[6] State v. Hicks (1989), 43 Ohio St.3d 72, 538 N.E.2d 1030.
[7] See State v. Mason, 82 Ohio St.3d 144, 1998-Ohio-370,694 N.E.2d 932.
[8] See State v. Keenan (1993), 66 Ohio St.3d 402, 613 N.E.2d 203.
[9] See State v. Hicks (1989), 43 Ohio St.3d 72, 538 N.E.2d 1030; Statev. Moritz (1980), 63 Ohio St.2d 150, 407 N.E.2d 1268; State v. Dixon,152 Ohio App.3d 760, 2003-Ohio-2550, 790 N.E.2d 349; State v. Grindle
(June 24, 1985), 12th Dist. No. CA84-11-079.
[10] See State v. Williams, 8th Dist. No. 80615, 2002-Ohio-4423.
[11] (Pa. 2004), 860 A.2d 102.
[12] State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883, citing United States v. Hasting (1983), 461 U.S. 499, 103 S.Ct. 1974;State v. Treesh, 90 Ohio St.3d 460, 2001-Ohio-4, 739 N.E.2d 749.
[13] Id.
[14] See, e.g., State v. Burrell, 1st Dist. C-030803, 2005-Ohio-34;State v. Penn, 1st Dist. No. C-030433, 2004-Ohio-1491; State v. Taylor,
1st Dist. No. C-020475, 2004-Ohio-1494; State v. Broe, 1st Dist. No. C-020521, 2003-Ohio-3054; State v. Condon, 152 Ohio App.3d 629,2003-Ohio-2335, 789 N.E.2d 696; State v. Carusone, 1st Dist. No. C-010681, 2003-Ohio-1018; State v. Fields, 1st Dist. Nos. C-010720 and C-010688, 2002-Ohio-4451; State v. Neeley (2001), 143 Ohio App.3d 606,758 N.E.2d 745; State v. Diaz (Dec. 8, 2000), 1st Dist. No. C-980186;State v. Roberts (2000), 139 Ohio App. 3d 757, 745 N.E.2d 1057; Statev. Freeman (2000), 138 Ohio App.3d 408, 741 N.E.2d 566; State v.Alfieri, 132 Ohio App. 3d 69, 724 N.E.2d 477.
[15] See, e.g., State v. Lynch, 98 Ohio St.3d 514, 2003-Ohio-2284,787 N.E.2d 1185; State v. Fears, 86 Ohio St.3d 329, 1999-Ohio-111,715 N.E.2d 136; State v. Wogenstahl, 75 Ohio St.3d 344, 1996-Ohio-219,662 N.E.2d 311.
[16] Evid. R. 801(D)(1).
[17] Id.
[18] State v. Huff (Feb. 1, 1995), 1st Dist. No. C-930861.
[19] State v. Iacona, 93 Ohio St.3d 83, 2001-Ohio-1292, 752 N.E.2d 937.
[20] See State v. Wilson, 74 Ohio St.3d 381, 1996-Ohio-103,659 N.E.2d 292.
[21] State v. Richey, 64 Ohio St.3d 353, 1992-Ohio-44, 595 N.E.2d 915.
[22] State v. McWhite (1992), 73 Ohio App.3d 323, 597 N.E.2d 168.
[23] (Oct. 13, 2000), 2d Dist. No. 00CA0025.
[24] State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52,678 N.E.2d 541.
[25] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[26] State v. Moore, 81 Ohio St.3d 22, 1998-Ohio-441, 689 N.E.2d 1.
[27] State v. Madrigal, 87 Ohio St.3d 378, 2000-Ohio-448, 721 N.E.2d 52.